GORHAM B. KNOWLES AND DIANA D. KNOWLES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Knowles v. Commissioner
Docket No. 29751-85
United States Tax Court
T.C. Memo 1991-57; 1991 Tax Ct. Memo LEXIS 72; 61 T.C.M. (CCH) 1886; T.C.M. (RIA) 91057; February 12, 1991, Filed *72 Decision will be entered under Rule 155. Peter S. Buchanan and Anne E. Thorkelson, counsel for the petitioners. Rebecca T. Hill, counsel for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax for 1981 and 1982 in the respective amounts of $ 211,887.00 and $ 20,064.50. The issues remaining for decision are whether petitioner Diana D. Knowles (petitioner) is entitled to a theft loss deduction or, alternatively, to a long-term capital loss deduction with respect to her investment in a coal mining limited partnership. Respondent contends that petitioners are not entitled to any deduction with respect to the investment for the years at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners were residents of San Francisco, California, at the time they filed their petition. Background
In 1976, petitioners invested in a coal mining limited partnership known as The Cumberland Group (Cumberland). In Tallal v. Commissioner, T.C. Memo 1984-486, affd. 778 F.2d 275 (5th Cir. 1985), another limited *73 partner in Cumberland contested respondent's disallowance for 1976 of the limited partners' share of the losses of Cumberland. The primary issues in Tallal v. Commissioner, supra, were: (1) Whether the coal mining activity of Cumberland was an activity engaged in for profit; (2) whether a $ 3 million nonrecourse note of Cumberland, issued as partial payment for advance royalties, should be recognized for Federal income tax purposes; and (3) whether and to what extent the $ 4,975,000 treated by Cumberland as an advance royalty constituted an ordinary and necessary business expense. In disallowing the claimed losses in Tallal v. Commissioner, supra, this Court concluded that the coal mining venture was a sham and that Cumberland was not engaged in an activity for profit. Petitioners herein have agreed to be bound by the outcome of Tallal v. Commissioner, supra, with regard to their entitlement to claim for 1976 their share of Cumberland's losses. In 1985, respondent mailed a notice of deficiency to petitioners determining certain adjustments to petitioners' 1981 and 1982 joint Federal income tax liabilities *74 that were unrelated to the Cumberland coal mining partnership, and petitioners filed a petition in this Court contesting the adjustments. Although the adjustments for 1981 and 1982 that were reflected in the notice of deficiency were settled, petitioners, by amended petitions herein, now claim a theft loss deduction for 1981 or 1982, or alternatively a long-term capital loss, relating to their investment in Cumberland. Petitioner's Investment
On December 27, 1976, petitioner invested $ 90,000 in cash for a 4.5-percent limited partnership interest in Cumberland. The coal property with respect to which Cumberland was to acquire mining interests was located in Mingo County, West Virginia. Cumberland's amended offering memorandum that was made available to petitioner and to other prospective investors highlighted the significant risks and very significant tax orientation of the proposed investments in Cumberland. The memorandum assured investors that if respondent disallowed the tax benefits to be claimed in connection with investments in Cumberland, the general partners -- not the individual investors -- would bear the costs of contesting the disallowance. The tax opinion *75 contained in Cumberland's amended offering memorandum essentially constituted a hypothetical or nonopinion due to its various disclaimers and assumptions, the reasonableness of which assumptions were themselves stated to have been assumed. Cumberland's amended offering memorandum also reflected numerous assumptions concerning the financial condition of the general partners, the operation of the proposed mining activities, and many other aspects of the proposed mining activities. The amended offering memorandum disclosed that the general partners of Cumberland and the mining operator hired to conduct the mining activities had conflicts of interest with regard to their relationships to Cumberland. On December 29, 1976, Cumberland received from its limited partners $ 2 million in cash as its initial paid-in capital. On the same day, Cumberland paid the lessor of the coal property an advance or minimum royalty payment of $ 4,975,000, consisting of $ 1,975,000 in cash and a $ 3 million nonrecourse promissory note. Also on December 29, 1976, Cumberland entered into an agreement with B-Rock Mining Company to mine the coal properties with respect to which Cumberland purportedly had purchased *76 a leasehold interest. Costs of the mining activities were, in part, to be paid with funds held in escrow by attorneys for Cumberland and for the general partners of Cumberland. In 1977 and early 1978, some limited mining activity allegedly was conducted on Cumberland's leasehold property in West Virginia. Due, however, to various problems such as bad weather, bad water drainage, and wildcat strikes by mine workers, little if any progress occurred with respect to the mining of coal on the property in West Virginia. Also, in July of 1978, the general partners of Cumberland were informed that a Mr. Martin Pomerance, an attorney for Cumberland, had embezzled $ 100,000 from Cumberland's escrow account that was maintained in connection with the mining activity. The law firm of Trubin, Sillcocks, Edelman, & Knapp (TSE & K), with which Pomerance was affiliated, agreed to reimburse Cumberland the $ 100,000. In the latter part of 1978 and 1979, disputes arose over ownership of the mining equipment, and it was discovered that the property leased by Cumberland contained substantially less coal reserves than had been estimated by Gaddy Engineering Corporation in a 1976 report to Cumberland. *77 It also was discovered that TSE & K had certain conflicts of interest relating to its representation of Cumberland that allegedly had not been previously disclosed. As a result of the many problems, perceived misrepresentations, and improper activities, Cumberland initiated lawsuits against various individuals and entities involved in the unsuccessful coal mining activities. Cumberland sued others, B-Rock Mining Company, the mining operator, over ownership of the mining equipment. It sued the TSE & K law firm. It sued Cotiga Development Company, and Black Rock Coal Company, other participants in the coal mining activities. It sued Gaddy Engineering Corporation over its inaccurate estimates of coal reserves on the partnership's leasehold property that had been prepared in 1976 for Cumberland and for the investors. It sued Martin Pomerance individually with respect to his misappropriation of $ 100,000 from the escrow account. Relief sought in the various lawsuits filed by Cumberland included temporary restraining orders, preliminary injunctions, and damages. In July of 1978, the TSE & K law firm paid Cumberland $ 100,000 in restitution of the $ 100,000 taken from the escrow *78 account by Pomerance. In 1980 and 1981, Cumberland settled the lawsuits. Under the settlements, Cumberland received in 1980 an additional approximate amount of $ 400,000 to $ 650,000 from the TSE & K law firm, and in 1982 Cumberland received $ 500,000 from Cotiga Development Company. In exchange for the $ 500,000 Cumberland received in 1982 from Cotiga Development Company, Cumberland transferred to Cotiga Development Company its interest in the West Virginia coal property. Although not completely clear from the record, petitioner's distributive share of the $ 500,000 was apparently $ 22,215 (4.455 percent times $ 500,000), and petitioner's adjusted basis in Cumberland's capital assets at that time appears to have been $ 87,986 (4.5 percent of 99 percent of $ 1,975,000). On its 1981 partnership information return, Cumberland reported the $ 650,000 received from TSE & K in the settlement of the lawsuits as essentially nontaxable under section 186. [1] On its 1982 partnership information return, Cumberland reported (with respect to the settlement of the lawsuits with Cotiga Development Company) a long-term capital gain in the amount of $ 4,619,513. This gain apparently relates to *79 aspects of the settlement of the various lawsuits under which certain property interests were transferred by Cumberland. Petitioner did not report as income on her and her husband's joint Federal income tax returns for 1981 and 1982 her share of the proceeds received by Cumberland in the settlement of the lawsuits. Petitioner did report on her and her husband's joint Federal income tax return for 1982 a $ 127,189 long-term capital gain with respect to the transfer of property interests that occurred under the settlement of Cumberland's lawsuits. Petitioners and respondent agree that the $ 127,189 long-term capital gain reported on petitioners' 1982 tax return was erroneous. Petitioner did not claim a theft loss with respect to her investment in Cumberland on her and her husband's 1981 or 1982 joint Federal *80 income tax returns. Nor did petitioner claim a theft loss deduction with respect to her investment in Cumberland in the petition as filed in this case. In her first amended petition filed in this case in September of 1987, petitioner claimed with respect to her investment in Cumberland that she was entitled for 1982 to a long-term capital loss. In her second amended petition filed in this case in November of 1987, petitioner for the first time claimed that she was entitled to a theft-loss deduction for 1981 or 1982 with respect to her investment in Cumberland. Cumberland has never claimed a theft loss on any of its partnership information returns with respect to its coal mining activities. OPINION Section 165[2] allows as a deduction any theft loss sustained during the year and not otherwise compensated for by insurance or otherwise. Under section 165(e), a theft loss is "sustained during the taxable year in which the taxpayer discovers such loss." Theft, as used in section 165, is "a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false *81 pretenses, and any other form of guile." Bellis v. Commissioner, 61 T.C. 354, 357 (1973), affd. 540 F.2d 448 (9th Cir. 1976); Nichols v. Commissioner, 43 T.C. 842, 884 (1965), quoting Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956). *82 Whether a loss from a theft has occurred depends, for Federal income tax purposes, on the law of the State or other jurisdiction where the loss allegedly was sustained. West v. Commissioner, 88 T.C. 152, 162 (1987); Luman v. Commissioner, 79 T.C. 846, 860 (1982); Monteleone v. Commissioner, 34 T.C. 688, 692 (1960). The exact nature of a theft, whether it be larceny, embezzlement, obtaining money by false pretenses, or other wrongful deprivation of property of another, is of little importance provided it constitutes a theft. West v. Commissioner, supra at 162-163. It is clear that under California law, the taking of money from another by false representations constitutes theft, People v. Kiperman, 69 Cal. App. 3d Supp. 25, 30, 138 Cal. Rptr. 271, 274 (1977); People v. Fujita, 43 Cal. App. 3d 454, 467, 117 Cal. Rptr. 757, 764 (1974); People v. Daniels, 85 Cal. App. 2d 182, 192 P.2d 788, 792 (1948), and we have applied this rule in determining whether a claimed loss was properly deductible as a theft *83 loss under section 165. Norton v. Commissioner, 40 T.C. 500, 503 (1963), affd. 333 F.2d 1005 (9th Cir. 1964); Monteleone v. Commissioner, supra at 692-693. Where alleged theft losses arise out of unsuccessful tax-avoidance schemes, the claimed theft-loss deductions often are disallowed on the grounds that the investors received what they bargained for (namely, risky and questionable tax-avoidance schemes) and that the investors' only real complaint is that the sought-after tax benefits were not realized. See, e.g., Marine v. Commissioner, 92 T.C. 958, 979 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Viehweg v. Commissioner, 90 T.C. 1248, 1255 (1988); West v. Commissioner, supra at 163-164. [3]
*84 To be entitled to a theft-loss deduction with respect to amounts paid in connection with a tax-avoidance scheme, "the taxpayer must demonstrate that he entered into the transaction only after having been deceived as to its nature." West v. Commissioner, supra at 163. "[C]redible evidence [must be submitted] that the form of the transaction was of critical importance to [the taxpayers]." Nichols v. Commissioner, supra at 887; see also Estate of Melcher v. Commissioner, 476 F.2d 398, 401 (9th Cir. 1973), affg. a Memorandum Opinion of this Court. Where the evidence indicates that the investors were essentially only interested in tax benefits and that they paid little attention to, and were essentially unconcerned with, the nature and specifics of the underlying transaction, they will not be entitled to a theft-loss deduction. Viehweg v. Commissioner, supra at 1255; West v. Commissioner, supra at 163; Nichols v. Commissioner, supra at 887; Estate of Melcher v. Commissioner, supra at 401. Petitioners in this case bear the *85 burden of proof as to their entitlement to the claimed theft-loss deduction. Rule 142(a). Petitioner acknowledges the significant tax orientation of her investment in Cumberland. Petitioner, however, argues that Cumberland (in making its investment in the West Virginia coal property) and the other limited partners of Cumberland (in making their investments in Cumberland), relied on the following representations and facts: (1) That the individual general partners of Cumberland and the attorneys associated with the transaction would act in good faith and not misappropriate funds; (2) That the coal property in West Virginia which Cumberland leased contained at least 6 million tons of coal reserves; (3) That $ 700,000 of the $ 1,000,000 placed in escrow by Cumberland would be used to buy mining equipment and that a first-priority security interest in the equipment would be perfected in favor of Cumberland; (4) That Cumberland would be the sole owner of coal recovered from the property; and (5) That written employment contracts would be entered into with certain key individuals who had experience operating coal mining properties.
The above representations and *86 facts did not in later years conform to reality, and petitioner argues that the above facts in 1976 were intentionally misrepresented to her and to the other limited partners of Cumberland, and that she and the other limited partners of Cumberland therefore were deprived of their investments in Cumberland through misrepresentations and fraud. Petitioner argues that such intentional misrepresentations and fraud, and the loss she incurred as a result thereof, support the theft-loss deduction now claimed in this case. We disagree. Certainly, petitioner's investment in Cumberland was ill advised and unfortunate. As we found in Tallal v. Commissioner, T.C. Memo 1984-486, affd. 778 F.2d 275 (5th Cir. 1985), and as is not disputed by petitioner herein, the investments in Cumberland and Cumberland's business plan were made without reliable information. They were put together by individuals who had little experience with coal mining and who had conflicts of interest. Cumberland was primarily a tax shelter scheme, and the investors in Cumberland could have had little good faith reliance or concern, based on the many assumptions and warnings in the amended *87 offering memorandum, that Cumberland would develop into a viable investment. Petitioner has not established that a theft occurred with respect to her investment in Cumberland. She purchased a tax shelter that offered her primarily the hope, although tenuous and risky, that she would reap substantial tax reductions if the investment was not questioned. She was forewarned at length in the amended offering memorandum that such tax benefits, and many other aspects of the investment, were not guaranteed. Unfortunately, all of the down-side risks of petitioner's investment materialized, while all of the potential up-side benefits evaporated. As petitioner points out, various improprieties occurred in connection with the attempted conduct of Cumberland's coal mining activities. The lawsuits filed in connection with such improprieties, however, were settled and Cumberland realized a substantial recovery with respect thereto. No theft other than that of Pomerance has been established in this case, and Cumberland received a total recovery with respect to Pomerance's theft. Petitioner argues briefly, and in the alternative, that she should be entitled to a long-term capital loss on the *88 sale of Cumberland's coal lease to Cotiga Development Company as part of the settlement of the various lawsuits. Based on the record, however, and on petitioners' failure in this case to establish that Cumberland was operated for profit and that it was participating in a legitimate business investment (see Tallal v. Commissioner, supra), no loss relating to Cumberland is deductible by petitioners. Sec. 165(c). For the reasons stated, petitioner is not entitled to the claimed theft-loss deductions, nor to the claimed long-term capital loss. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sec. 165 provided in relevant part: (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -- In the case of an individual, the deduction under subsection (a) shall be limited to -- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *
* * * (e) Theft Losses. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩
3. See also McCullough v. Commissioner, T.C. Memo 1990-653 (decided primarily on the basis of whether the alleged theft loss occurred in the year before the Court); Lewis v. Commissioner, T.C. Memo 1962-306; Dooley v. Commissioner, T.C. Memo 1962-305, affd. 332 F.2d 463↩ (7th Cir. 1964).